Filed 1/20/26  P. v. Hayes-Kelly CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100749 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 19FE014513 & 20FE007348) |
| v. | |
| NICHOLAS HAYES-KELLY, | |
| Defendant and Appellant. | |

Defendant Nicholas Hayes-Kelly, an Oak Park Bloods gang member, shot at rival gang members in another car while stopped at a traffic light, hitting two of the three occupants.  A jury found defendant guilty of discharging a firearm at an occupied motor vehicle, attempted murder, three counts of assault with a semiautomatic firearm, and possession of a firearm by a felon, and found true numerous enhancement allegations. Defendant was sentenced to 110 years to life plus 25 years determinate in state prison.

On appeal, defendant argues the trial court abused its discretion in (1) ordering him shackled during trial, (2) denying his *Marsden* motion, (3) denying his *Faretta* motion, and (4) admitting into evidence two rap music videos.  He further argues that he was deprived of the constitutionally effective assistance of counsel based on his trial

1

attorney's (5) failure to file a motion to exclude or limit firearm expert testimony or to impeach that testimony, and (6) failure to object to the admission of certain evidence and the prosecutor's misuse in argument of limited purpose evidence.  We will affirm.

BACKGROUND

A second amended information charged defendant with discharging a firearm at an occupied motor vehicle (Pen. Code, § 246; count one),[1] attempted murder (§§ 664, 187, subd. (a); count two), assault with a semiautomatic firearm (§ 245, subd. (b); counts three-five), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count six).  The information alleged defendant personally discharged a firearm proximately causing great bodily injury as to counts one and two (§ 12022.53, subd. (d)), personally used and personally discharged a firearm as to count two (§ 12022.53, subd. (b), (c) & (e)(1)), personally used a firearm causing the offense to become a serious and violent felony as to counts two through five (§§ 12022.5, subd. (a), 1192.7, subd. (c)), personally caused great bodily injury to someone other than an accomplice as to counts three through five (§§ 667.5, subd. (c)(8), 1192.7, subd. (c)(8), proximately caused great bodily injury as to counts one, two, and five (§ 12022.7), and alleged a gang enhancement as to each count (§ 186.22, subd. (b)(1)).  The information alleged defendant had a prior strike (§ 667, subd. (a)), bringing him within the sentencing provisions of sections 667, subdivisions (b) through (i), and 1170.12.

*Trial on the Substantive Counts*

*The August 10, 2019, Shooting*

A.J.[2] testified under subpoena.  In August 2019, A.J. was driving a car accompanied by his cousin, K.K., and a female friend, S.G., when he and K.K. were shot.

---

[1]     Undesignated section references are to the Penal Code.

[2]     To protect their privacy, we will refer to the victims and witnesses by their initials. (Cal. Rules of Court, rule 8.90(b)(4), (10) & (11).)

2

S.G. was not hit by the gunfire. A.J. could not recall what happened because he was under the influence of alcohol and drugs that day. He denied being a Starz gang member. Sacramento Sheriff's Detective Alex Zakrzewski spoke with A.J. at the hospital. In the interview, which was played at trial, A.J. told Detective Zakrzewski he was a Starz member.

K.K. also testified under subpoena. K.K. testified that he did not recall getting shot, and he did not see who shot him. He was in a car with A.J. and a female at the time and testified he was not in a gang.

T.P. testified that, on August 10, 2019, she was in a Prius with her sister at 65th Street and Stockton Boulevard, in the left turn lane, when the passenger side of her vehicle was struck by gunfire.

Deputy Brandon Feldman obtained surveillance video from the Pints-N-Fifths liquor store on Stockton Boulevard, which was played at trial. Detective Zakrzewski described what appeared on the video. A black Pontiac pulled in and parked, codefendant Joe Rhodes got out of the driver's seat, retrieved a child from the back seat, and walked out of the frame. Another individual exited the rear passenger side of the car and looked around the parking lot. Detective Zakrzewski testified that this individual was similar in stature and appearance to defendant, including his beard. Codefendant Rhodes returned to the vehicle and got in. An arm could be seen extending out of the front passenger window of the Pontiac, indicating there was a third person in the car. At some point, A.J. and K.K.'s vehicle pulled into Pints-N-Fifths and parked, and A.J. exited the vehicle. Later, A.J. got back into the driver's seat of his car and drove off, turning right out of the parking lot. The Pontiac then did "somewhat of a U-turn in the parking lot" and went out the same exit as A.J.'s car. Detective Zakrzewski was also able to discern the Pontiac's license plate number from the surveillance video. K.K. told Sacramento Sheriff's Detective Steven Abelia that, just before the shooting, he had left a liquor store at 47th Avenue and Stockton Boulevard.

3

Detective Zakrzewski also described what he observed on other surveillance videos recorded at the intersection of Stockton Boulevard and 65th Street. A.J. and K.K.'s white vehicle and T.P.'s Prius can be seen stopped at the intersection. A gas station surveillance video showed the Prius in a turn lane and the victims' car on the passenger side of the Prius. The black Pontiac then pulled up to the intersection on the passenger side of the victims' vehicle. The video showed an object emerge from the Pontiac's driver's side rear window, and then smoke consistent with muzzle smoke coming from that window. This occurred at 12:57 p.m. Detective Zakrzewski estimated that it would take approximately three minutes to travel from the Pints-N-Fifths liquor store to Stockton Boulevard and 65th Street.

*Codefendant's Acquaintances and the Pontiac*

K.H., testifying under subpoena, shared a son with codefendant Rhodes. On August 10, 2019, codefendant delivered their son to her at the Pints-N-Fifths liquor store. Before the exchange, codefendant told K.H. on the cell phone that he was with "Nick" and "Drai".

On August 11, 2019, Sacramento Sheriff's Sergeant Kenny Shelton went to an address associated with codefendant Rhodes. There, he observed the black Pontiac. J.W., who shared two children with codefendant, told Sergeant Shelton that the Pontiac belonged to her. She acknowledged that codefendant sometimes drove it.

*August 18, 2019, Yuba County, and the Firearm*

S.D., who testified under subpoena, had children with defendant. The prosecution played a 911 call placed by S.D.'s brother, E.H., in Yuba County on August 18, 2019. In the call, E.H. reported that S.D. and defendant were fighting, and that defendant had a black nine-millimeter gun pointed at her.

Detective Tyler Johannes of the Yuba County Sheriff's Department responded to the 911 call. When he arrived, a group of five or six people approached him. One, B.H., was carrying a backpack. Detective Johannes searched the backpack and found a

4

Springfield nine-millimeter firearm. Deputy Jeff Murphy asked S.D. about the firearm, and she told Deputy Murphy the gun was defendant's.

Yuba County Sheriff's Deputy Christopher Atwood located defendant in the parking lot of a gas station in the area. Defendant said he was coming from his brother's house, but he could not provide an address. He said he could not remember the address, and that he was not familiar with the area. Before defendant was placed in a patrol vehicle, a woman approached defendant while he was speaking with Deputy Atwood. The woman spoke to defendant and then entered the food mart attached to the gas station. When she left the food mart Deputy Atwood attempted to gather information from her. Deputy Atwood noted she was looking over his shoulder, and when he turned, he saw defendant in the patrol vehicle shaking his head in an exaggerated manner.

*Cell Phone Location Evidence*

Daniel Garbutt testified as an expert in call detail records, geolocation analysis, and forensic cell phone analysis. He testified that call detail records indicated that cell phones associated with defendant and codefendant Rhodes were connected to a cell tower near the Pints-N-Fifths liquor store at some time between 12:40 and 12:46 p.m. on August 10, 2019.

*Gang Evidence*

On May 16, 2015, Sacramento Police Officer Michael Magaletti contacted a car driven by C.W. While Officer Magaletti was speaking with C.W., defendant approached the car. Officer Magaletti asked C.W. about his gang affiliation, and defendant laughed and said, "Starz down." According to Detective Terrence McDonald of the Sacramento County Sheriff's Department, defendant was "letting the officer know that he don't mess with the Star[z] gang members."

The prosecution played for the jury portions of a phone conversation between the prosecutor and A.J. In the call, A.J. indicated he did not want to testify, stating that he was "a gang member from one side and they're gang members from the other side." A.J.

5

told the prosecutor he was not an average citizen, but rather was a "fuckin' high-rankin' gang member . . . ."

Detective McDonald testified as an expert in criminal street gangs. Detective McDonald testified that the primary rivals of the Oak Park Bloods are the Stickup Starz. The two gangs engage in shootings and fights with each other. They also make videos disrespecting each other. In August 2019, relations between the two gangs were bad.

Detective McDonald testified that defendant and codefendant Rhodes were both Oak Park Bloods gang members. They both had gang tattoos. Both had been observed in the presence of gang members. Both posted photos to social media in which they were with other Oak Park Bloods members, and throwing up Oak Park Bloods gang signs.

Detective McDonald testified that A.J. and K.K. were members of Stickup Starz in August 2019. He also testified that he had seen rap gang videos posted on YouTube in which A.J. and K.K. appeared.

Regarding the surveillance video from the Pints-N-Fifths liquor store, Detective McDonald testified that, if the occupants of the black Pontiac were Oak Park Bloods members, they would have a motive to kill A.J. because he was a known Starz member and he could be seen in videos disrespecting Oak Park Bloods members.

*Firearms Evidence*

After the shooting, Deputy Feldman found 10 spent nine-millimeter cartridge casings in the intersection.

Detective Zakrzewski obtained the firearm recovered in the Yuba County case and submitted it for analysis. A criminalist obtained a DNA sample from the firearm, but she was not able to interpret it because it was a mixture with more than four contributors.

Jeremy Zerbe, a criminalist, testified as an expert in forensic firearm analysis. Asked to describe what data would have to be present for him to make an identification that a subject round and a test round were sufficiently similar to support the conclusion that they were fired from the same firearm, Zerbe testified that "the criteria I am using is

6

two groups of three consecutive matching stria or one group of six." He reiterated that he was "looking for two groups of three or one group of six or anything in excess of that, but that's the minimum criteria."

Criminalist Zerbe analyzed the Springfield nine-millimeter firearm and the 10 cartridge casings. He determined that all 10 cartridge casings had sufficient agreement of individual features for him to conclude that they were all fired by the same firearm. Zerbe test-fired the Springfield and compared the cartridge casings from the test fires with one of the cartridge casings recovered in this case. He concluded that the cartridge casing recovered in this case was fired from the same firearm as the three test fires and, because he had already concluded that all 10 recovered cartridge casings were fired from the same firearm, he further concluded that all 10 cartridge casings were fired by the Springfield.

*Bifurcated Trial on the Gang Enhancement Allegations*

Sacramento Police Officer Jeffrey Carr testified concerning the details of one Oak Park Bloods predicate offense. Sacramento Police Sergeant Larry Trimpey testified concerning a second. No issue presented on this appeal requires a recitation of the underlying facts. Detective McDonald testified that the individuals convicted in the first predicate offense were Oak Park Bloods gang members who committed the offense for the benefit of the Oak Park Bloods criminal street gang. He testified that two of the individuals convicted on the second predicate offense were also Oak Park Bloods members, and a third was a member of the Strawberry Manor Bloods, an Oak Park Bloods ally. Detective McDonald opined that they committed the shooting for the benefit of the Oak Park Bloods.

Detective McDonald testified that the Oak Park Bloods had a common gang sign and common symbols. He testified that the gang's primary activities included assault likely to cause great bodily injury, assault with a firearm or semiautomatic firearm, murder, attempted murder, and manslaughter. Asked a hypothetical involving facts

7

mirroring those in this case, Detective McDonald opined that the shooting was committed for the common benefit of the Oak Park Bloods with the intent to assist, further, and promote its criminal activities.

*Verdicts and Sentencing*

The jury found defendant guilty on all counts and found true all enhancement allegations. The trial court sentenced defendant to an indeterminate term of 110 years to life, plus a determinate term of 25 years in state prison.

DISCUSSION

I

*Shackling Order*

A.    *Additional Background*

On January 8, 2024, the day scheduled for in limine motions, Deputy Chelsea Serrano, on behalf of the Sacramento County Sheriff's Court Security Division, requested a security hearing. She opined that defendant posed a serious threat to the personal safety of officers, court personnel, and the public unless appropriate security measures were taken. She stated that, since 2015 and throughout his custody periods, defendant had been written up 26 times, 17 of which were for major offenses. The majority of those offenses were violent and included assaulting officers, insubordination, disobeying officer directions, and rule violations. Deputy Serrano listed a number of defendant's violations, including six separate instances of assault against another inmate; tampering with his cell door lock and threatening staff; two additional instances of threatening staff; possession of contraband and insubordination with staff; refusing instructions to return to his cell and attempting to push past a deputy and resisting that deputy, causing them to fall to the ground and requiring the assistance of other deputies to restrain defendant; possession of a shank during transportation between facilities; vandalizing and destroying clothing and property; and possession of prescription medication, tobacco, drugs or alcohol. Deputy Serrano stated that defendant had demonstrated that he does not follow

8

deputies' instructions, that he has no respect for authority, that he is very deceitful, that he is willing to fight anyone, whether in uniform or otherwise, and that he will make or use any weapons any time he has the chance. The Sheriff's Department requested that defendant be secured to a court security chair with his hands and feet chained during trial.

The trial court asked for the defense's response. Defense counsel stated: "Join the request and submit."

Defendant personally responded that the write-ups were exaggerated. He stated that the fights were "a mutual fight, me defending myself." He emphasized that he was in the general population, as opposed to administrative segregation, and claimed that he was respectful, quiet, and compliant. He acknowledged that he could be hostile at times, but explained that he was "in a hostile environment," and that sometimes he had to be aggressive because he was "locked in cages with other people that might not care about me trying to do good."

The trial court stated it credited some of what defendant said. However, the court also stated that 17 major write-ups, and many violent write-ups, were concerning, and it singled out the "shank event." Defendant responded that what he had possessed was a "tattoo needle," a staple, which staff characterized as a shank. Defendant asserted that other officers, such as Deputy Christopher Lucero, who was in court, would have a different opinion from Deputy Serrano's. Deputy Lucero characterized defendant as "normal, as far as non-assaultive or having issues. With that being said, eight west is the max security floor where you do get sent for your punishments."

The trial court concluded that some form of restraint was necessary. The court continued: "It doesn't mean that I think you're going to act up in court . . . . I don't reach that conclusion, but I am concerned, based upon this record, and I am going to at least require that you be chained to the chair, it's done in a fashion that can't be seen by the jurors, and the record will also show that the counsel table is skirted all the way around."

9

The next day, after jury voir dire, the trial court proposed revisiting the shackling order, and defense counsel agreed. The court stated it wanted to have both of defendant's hands unrestrained. Defense counsel agreed. The court stated, "[s]o he is cuffed on one hand, I think. He will be uncuffed."

Defendant argues that the trial court abused its discretion and violated his federal constitutional rights by ordering that he be shackled during trial. We find no abuse of discretion.

B.       *Shackling Orders*

" 'In general, the "court has broad power to maintain courtroom security and orderly proceedings" [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.] However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." [Citation.] Similarly, the federal "Constitution forbids the use of visible shackles . . . unless that use is 'justified by an essential state interest'—such as the interest in courtroom security— specific to the defendant on trial." ' " (*People v. Ng* (2022) 13 Cal.5th 448, 534.)

" ' "In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior." ' " (*People v. Ng, supra*, 13 Cal.5th at p. 534.) " 'The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion.' " (*Ibid.*) " 'To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason."

10

[Citations.] A merely debatable ruling cannot be deemed an abuse of discretion.' " (*People v. Miracle* (2018) 6 Cal.5th 318, 346 (*Miracle*).)

### C. *Analysis*

The trial court based its shackling order on the representations of Deputy Serrano, speaking on behalf of the Sacramento County Sheriff's Court Security Division. She reported that, while incarcerated, defendant had been written up 26 times since 2015, 17 of which were for major offenses, the majority violent. They included six separate instances of assault against another inmate; tampering with his cell door lock; three instances of threatening staff; refusing instructions to return to his cell and resisting a deputy; and possession of a shank. The Supreme Court has stated that the requirement of a showing of a manifest need for restraints "is satisfied by evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1031.) Apart from violent outbursts in court, defendant engaged in each of the types of behavior discussed in *Lewis and Oliver*. We conclude the trial court's shackling order was supported by the evidence. (See *Miracle, supra*, 6 Cal.5th at p. 347 [shackling order was not an abuse of discretion based on evidence of four violent incidents while the defendant was in custody].)

Defendant asserted the offenses were exaggerated, that his assaults on other inmates involved mutual combat, and that the shank was a "tattoo needle," a staple. Deputy Lucero characterized defendant as "normal, as far as non-assaultive or having issues," although he noted defendant's housing "is the max security floor where you do get sent for your punishments." These counterpoints presented a matter for the trial court to resolve. We cannot say that the trial court " ' " 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Miracle, supra*, 6 Cal.5th at pp. 346-347.)

11

Defendant acknowledges his performance while incarcerated "was undoubtedly poor," but asserts that he had "appeared in court for years and there was no indication he was a threat in court . . . ." However, the Supreme Court noted in *Miracle* that the fact that the violent instances in that case that justified the shackling order "occurred outside of the courtroom does not diminish their relevance or their support for the trial court's order." (*Miracle, supra*, 6 Cal.5th at p. 347.)

Defendant relies on *People v. Duran* (1976) 16 Cal.3d 282, in which the Supreme Court concluded that a shackling order was an abuse of discretion. (*Id*. at p. 293.) In *Duran*, the Supreme Court stated: "No reasons for shackling the defendant appear on the record. There is no showing that defendant threatened to escape or behaved violently before coming to court or while in court." (*Ibid*.) The same cannot be said of defendant here. Defendant also relies on remarks the trial court made in making its shackling order: "It doesn't mean that I think you're going to act up in court . . . . I don't reach that conclusion . . . ." In context, we do not take the trial court's remarks as a finding that there was no manifest need for restraints or that the interest in courtroom security did not justify the shackling order. (See generally *People v. Ng, supra*, 13 Cal.5th at p. 534.) Rather, we interpret this language as informing defendant the court was not *certain* defendant would act out violently and respecting defendant's dignity, while at the same time taking what it deemed to be prudent precautions to ensure courtroom safety.

Lastly, "when the evidence establishes a manifest need for restraints, the court should impose the least obtrusive or restrictive restraint that would be effective under the circumstances." (*People v. Poore* (2022) 13 Cal.5th 266, 285.) Here, the trial court ordered defendant restrained to his chair, but noted that "it's done in a fashion that can't be seen by the jurors," and that "the counsel table is skirted all the way around." During the *Marsden* motion immediately following the shackling discussion (*People v. Marsden* (1970) 2 Cal.3d 118), the trial court clarified that defendant's writing hand was to be unrestrained. The following day, the court revised its order so that both of defendant's

12

hands would be unrestrained.  We conclude the trial court's order amounted to the least obtrusive restraint that would be effective under the circumstances.  (*Poore,* at p. 285.)

## II

## Marsden *Motion*

### A.    *Additional Background*

During the discussion on the shackling order, the trial court asked Deputy Serrano whether she believed defendant's hands should be restrained, and she replied that his hands could be unrestrained as long as he was chained to the chair.  The court then turned to defense counsel, who said:  "I want his hands chained."

Defendant stated:  "As far as the relationship goes between me and him, . . . it's not a good relationship. . . .  I'm not comfortable with him dealing with my case.  I'm not comfortable going to trial with him.  It's a constant struggle.  [¶]  Like, I ask him to do simple things and–that makes me feel comfortable, that's in the benefit of me because it is my life that's on the line, and he's always . . . I'm not even just gonna put it on him. . . .  [M]aybe I'm just not understanding the things that he say[s], but . . . since I have known him and met him, it's always just been, like, bad, just constant.  [¶]  . . .  It's frustrating, because I have done the things accordingly–the process of trying to do Marsden motions, and I've even went as far as to go pro per just to get him off of my case so I can get a fresh start with a different attorney, and it leads back to this.  [¶]  And I shouldn't be having to go to trial with an attorney who wants me to be chained.  [¶]  You should be trying to get me out of chains and not keep me secured to a chair if you're on my side."  Defendant stated he would like to request a new attorney.

Defendant opened the ensuing *Marsden* hearing by stating that his objections to defense counsel related to strategies and that counsel did not file motions defendant wanted him to, such as a motion to suppress the gun and a motion to dismiss.  He then emphasized that counsel wanted him chained.  "[I]f someone is here to help me, you wouldn't want me in chains. . . .  [I]f you're on my side and you're really trying to help

13

me and your intentions are good and you have me in your best interest, then we wouldn't be going through what we doing.  [¶]  It's not like it's a one-time thing.  It's constant."

The trial court stated that it had read the file, adding that defense counsel had not filed a motion to dismiss because such a motion would be "an absurd motion" and, lacking a legitimate basis, an unethical one.  The court also stated there was no basis for a motion to suppress the gun.  The court emphasized that trial strategy was a matter left to the attorney's discretion.

Defense counsel stated that defendant had "a bit of a temper when he doesn't get to hear what he wants, and I think that that is more my concern versus any sort of communication issue.  I believe that we communicate well in the sense that the ideas flow."  Defense counsel also stated that the prosecution had made what he characterized as a very good offer which defendant declined, and defense counsel had submitted counteroffers.  Defense counsel then stated, "when I let him know I don't control whether the District Attorney's gonna except [*sic*] or not, it brings up that frustration, the anger, where he'll leave the interview room, where he'll say things like, I'm gonna get another lawyer and I know how to do that, or it's a little ominous . . . and I guess my concern is more so with his fights when he's facing one of those frustrating situations, which this trial will have . . . ."  Defense counsel, referring to the shackling order, then stated, "I think that this is just a necessary precaution as I don't want to get smacked in the mouth if he hears something that he doesn't like up there."  Asked by the trial court if defendant had ever done anything threatening toward him, defense counsel responded, "not overtly, but . . . when he is upset and he storms out of the room, he'll make statements not like, I'm gonna do a Marsden.  He'll . . . say I'm gonna get another lawyer and I know how to do that, or I'm gonna get you off the case, believe that."

Defendant stated that, when frustrated, he does not engage in violence.  Instead, he just walks away, noting that "we can revisit the next day."  He continued:  "[M]aybe we don't agree.  That's his right.  That's my right, but to say that, Oh, I'm gonna go straight

14

to being violent, . . . that's just stereotypical, and it's just judging me, and it's not right. [¶] And to sit in front of 12 people who already have a perception like, oh, this is a violent case, . . . why do we have that guy chained to a chair? . . . You're already swaying the jurors, and you're already making them believe that this guy needs to be in jail because he can't even sit in a chair without being in chains . . . ."

The trial court ordered defendant's writing hand unrestrained and assured defendant the jury would not be able to see that he was restrained. The court then denied defendant's *Marsden* motion.

Defendant argues that the trial court abused its discretion and violated his Sixth Amendment rights by denying his *Marsden* motion. We disagree.

B.      *Motions for Substitution of Appointed Counsel*

A defendant is entitled to substitution of appointed counsel pursuant to *People v. Marsden, supra*, 2 Cal.3d 118 " 'if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599 (*Taylor*).) An appellate court reviews the denial of a *Marsden* motion for abuse of discretion. (*Ibid.*) "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*Ibid.*)

C.      *Analysis*

Defendant initially stated that his objections to defense counsel related to strategic matters and that counsel did not file motions defendant wanted him to. The trial court responded that it had read the file, and that defense counsel had not filed a motion to dismiss because such a motion would be "an absurd motion" and therefore unethical to file, and that there was no basis for a motion to suppress the gun.

The trial court also correctly emphasized that trial strategy generally was a matter left to the attorney's discretion. " 'A defendant does not have the right to present a

15

defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] Tactical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict." " . . . [C]ounsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." ' " (*People v. Jackson* (2009) 45 Cal.4th 662, 688; see *People v. Poore, supra*, 13 Cal.5th at p. 307 ["Defendant had no right to control *how* his lawyer would present a defense if he chose one because '[t]rial management is the lawyer's province' "], quoting *McCoy v. Louisiana* (2018) 584 U.S. 414, 422.) The record does not show that appointed counsel was not providing defendant with adequate representation.

That defense counsel joined in the request that defendant be restrained appears to be the principal basis for defendant's *Marsden* motion. He emphasizes that, in joining in the request to have him shackled during trial, defense counsel took a position directly opposed to his interests. We cannot consider defendant's argument in a vacuum. We have concluded that the trial court did not abuse its discretion in ordering defendant restrained based on his record of offenses while incarcerated, many of them violent. Additionally, defendant made remarks to defense counsel which counsel found "ominous," including suggesting that he knew how to get defense counsel off the case and secure different representation, possibly through means other than a *Marsden* motion. To state the obvious, these are not ideal circumstances. However, we conclude that the record does not establish that defendant and appointed counsel had " 'become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*Taylor, supra*, 48 Cal.4th at p. 599.)

Defense counsel stated that he believed he and defendant communicated well together "in the sense that the ideas flow." He described his communication with defendant concerning a plea offer, the defense's counteroffers, and defense counsel informing defendant that how the prosecutor would respond was beyond their control. Defendant acknowledged, before the commencement of the *Marsden* hearing, that it was

16

possible he was just not understanding everything defense counsel tried to convey. Defendant also acknowledged that, when he got frustrated with appointed counsel, he would "walk away," noting that "we can revisit the next day." Defendant noted that sometimes "maybe we don't agree. That's his right. That's my right. . . ."

Defendant has not shown that defense counsel's joinder in the request that he be restrained created an irreconcilable conflict likely to result in counsel's ineffective representation of defendant. (See generally *Taylor, supra*, 48 Cal.4th at p. 599.) Defendant ultimately was restrained in a manner unapparent and unknown to the jury. Defense counsel's actions did not rise to the levels of dysfunction seen in the cases on which he relies. In *United States v. Adelzo-Gonzalez* (9th Cir. 2001) 268 F.3d 772, the defendant alleged that his attorney used "bad language and threats" against him, including that the attorney "would 'sink him for 105 years' and that the attorney would testify against him," and he "expressly called [the defendant] a liar." (*Id*. at p. 779.) In *United States v. Velazquez* (9th Cir. 2017) 855 F.3d 1021 (which is miscited), the defendant claimed her attorney failed to advise her of a plea deal set to expire that day, the attorney reported problems communicating with the defendant, and the attorney "made gratuitous statements about . . . the fact that the prosecutor would have 'no problem with her getting 38 to 42 years, none whatsoever.' " (*Id*. at p. 1036.)

Plainly, defendant was frustrated with appointed counsel and felt betrayed when counsel joined in the restraint request. This does not establish entitlement to substitution of counsel, however. "A ' " 'lack of trust in, or inability to get along with, an appointed attorney' " ' is an inadequate basis on which to substitute counsel." (*People v. Clark* (2011) 52 Cal.4th 856, 918.) Considering the totality of the circumstances, we conclude that defendant's right to the assistance of counsel was not impaired.

17

# III

## Faretta *Motion*

### A.     *Additional Background*

Immediately after the trial court denied defendant's *Marsden* motion, defendant moved to represent himself under *Faretta v. California* (1975) 422 U.S. 806.  The trial court stated that he had "done that before, and sensibly you changed your mind," adding that it was not going to allow defendant to begin representing himself "on the day of trial."  The court said, even if defendant's desire to represent himself was wise, "the timing of it is such that I would not grant it."  Defendant asserted that he would be ready to proceed with trial.  He stated he had agreed to accept representation after previously representing himself only because he believed he would be appointed a different attorney.  The court responded, "that may be, but, again, that is some time ago.  This is the day of trial, and if you had the understanding that you were going to get some attorney that you didn't get, that didn't happen yesterday.  That happened a long time ago."  The court continued:  "I'm not at all suggesting you're playing a game.  I don't think you are, but the point of it is . . . I'm not going to grant a decision to go pro per on the day of trial when the person's already been pro per, . . . resumed having representation, and then goes for a significant period of time, and then on the day of trial says, I'm now going to go pro per because the Marsden motion didn't go my way."

During later proceedings, the trial court "augment[ed]" its ruling.  The court stated that, after addressing in limine motions, it hoped defendant saw that he benefited by having an attorney represent him generally and appointed counsel specifically.  The court stated that, in denying defendant's *Faretta* motion, it had relied on the quality of counsel's representation, defendant's prior proclivity to seek to substitute counsel, the reasons for defendant's request, the length and stage of the proceedings, and the disruption or delay that might follow if the motion was granted.

18

Defendant argues that the trial court abused its discretion and violated his Sixth Amendment right to self-representation by denying his *Faretta* motion as untimely. We disagree.

### B. *Motions for Self-representation*

"The United States Supreme Court has made clear that a criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses. [Citation.] A trial court must grant a defendant's request for self-representation if the request is made within a reasonable time prior to the commencement of trial, is unequivocal, and is made voluntarily, knowingly, and intelligently." (*People v. Frazier* (2024) 16 Cal.5th 814, 843.)

### C. *Timeliness*

" '[T]imeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made. . . [This] is in accord with the purpose of the timeliness requirement, which is "to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice." ' " (*People v. Buenrostro* (2018) 6 Cal.5th 367, 426.) The Supreme Court has "routinely declined to identify a specific period in time at which a self-representation motion is untimely." (*People v. Wright* (2021) 12 Cal.5th 419, 436.) But it has " 'held on numerous occasions that *Faretta* motions made on the eve of trial are untimely.' " (*Ibid*.) It has also held that "*Faretta* motions 'made long before trial were timely.' " (*Ibid*.) In considering the totality of the circumstances, "a trial court may properly consider 'not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation.' " (*People v. Johnson* (2019) 8 Cal.5th 475, 500.)

19

Defendant brought his *Faretta* motion on January 8, 2024, the day on which the trial court ruled on motions in limine. The trial court conducted jury voir dire and swore in the jury the next day, and the presentation of evidence commenced the day after that. Defendant concedes that, ordinarily, this would render his motion untimely.

There is no dispute that appointed counsel was ready to proceed to trial.

This case was somewhat complex. It would involve not only percipient witness testimony, but also substantial presentation of evidence concerning gang issues, as well as expert testimony on more than one subject. More than 40 witnesses testified at trial. An unusually high number of those witnesses were reluctant; many witnesses testified under subpoena.

Defendant had earlier opportunities to assert his right to self-representation. In fact, on November 22, 2022, defendant was given *Faretta* warnings, and the trial court granted his request to represent himself. As of January 9, 2023, defendant was still representing himself. On March 17, 2023, the trial court granted defendant's request for the appointment of counsel.

Defendant's stated rationale for his *Faretta* motion was that he had been under the mistaken belief that, when he requested the appointment of counsel after representing himself, he would be appointed a *different* attorney. The trial court correctly observed, "that didn't happen yesterday. That happened a long time ago." Defendant's disappointment with the reappointment of counsel arose on or around March 17, 2023, more than nine months before he made this *Faretta* motion.

Defendant argues that he did not seek a continuance, he had previously represented himself in this case, he was familiar with the charges and evidence, and the trial court stated it did not think defendant was " 'playing a game.' " Defendant relies on *People v. Best* (2020) 49 Cal.App.5th 747, in which the defendant made her *Faretta* motion on June 1, 2018, five days before the next trial readiness date. (*Id.* at p. 763.) At the June 4, 2018, *Faretta* hearing, the court informed the defendant that trial could begin

as soon as June 6, 2018. (*Ibid*.) The defendant did not request a continuance and represented that she could be ready for trial. (*Ibid*.) The appellate court concluded that the "trial court did not find the motion untimely or find it would cause delay, and there is no basis to conclude it was brought for purposes of, or would have caused, delay." (*Ibid*.) The appellate court reversed the denial of the *Faretta* motion. (*Id*. at p. 764.) Here, however, the trial court *did* find defendant's *Faretta* motion untimely. Notwithstanding the court's statement that it did not think defendant was "playing a game," defendant's history with counsel, his stated reason for seeking self-representation, and waiting to make his second *Faretta* motion until the eve of trial after his latest *Marsden* motion was denied (and more than nine months after counsel was reappointed), all support an implied finding that the request was for purposes of, or would cause, delay. (See *People v. Perez* (1992) 4 Cal.App.4th 893, 904-905 [failure to assert *Faretta* motion the previous day, when the court denied his *Marsden* motion, justified an implied finding that the request, made on the day trial was to commence, was made to disrupt the proceedings and continue the trial].)

Defendant also argues on appeal that his attorney's joinder in the request that he be restrained was adverse to his interests and implicated his right to autonomy over his defense. The People counter that defendant forfeited the issue by failing to raise it in the *Faretta* hearing before the trial court. After asking to represent himself, and during the entirety of the ensuing *Faretta* hearing, defendant did not rely on, or refer to, appointed counsel joining in the request for an order restraining him. The colloquy concerning the shackling order, the *Marsden* hearing, and the *Faretta* hearing did follow immediately one after the other. Whether or not one parses these matters into discrete, self-contained proceedings, however, defendant did not raise counsel's joinder in the request for a shackling order as a basis for his *Faretta* motion. In his reply brief, defendant argues that he raised counsel's joinder in the shackling request "before the court denied his *Faretta* motion." This is true, as far as it goes. The salient point is that defendant did not argue

21

the joinder as a basis for his *Faretta* motion, or even mention it during the *Faretta* hearing, and he did not assert that the issue affected the timeliness analysis. "A defendant ordinarily cannot obtain appellate relief based upon grounds that the trial court might have addressed had the defendant availed himself or herself of the opportunity to bring them to that court's attention." (*People v. Fuiava* (2012) 53 Cal.4th 622, 655.) Defendant in reply states we could exercise our discretion to consider this argument, though he does not expressly request that we do so. We decline to exercise our discretion in this regard. We conclude defendant's *Faretta* motion was untimely.

D.      *Abuse of Discretion*

" '[W]hen a defendant's motion [for self-representation] is untimely, the motion is "based on nonconstitutional grounds" [citation] and it is "within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*." ' " (*People v. Frazier, supra*, 16 Cal.5th at pp. 843-844.) "In exercising its discretion, 'the trial court should inquire into the defendant's reasons for the request[s]' and should consider factors including ' "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 399.) The trial court expressly relied on these factors here.

The record supports the conclusion that appointed counsel afforded defendant quality representation. During the *Marsden* hearing, the trial court remarked that appointed counsel was "a really fine attorney who I know will do a very good job for you," and that appointed counsel was "way above" the standard of adequate representation. The trial court characterized counsel's representation of defendant as "strong."

Before defendant's January 8, 2024, *Faretta* motion, he had made a *Marsden* motion on June 30, 2022. In November 2022, the trial court granted defendant's first

22

*Faretta* motion. In March 2023, the trial court granted defendant's request for the appointment of counsel. Immediately before his second *Faretta* motion, he made an unsuccessful *Marsden* motion.

We have already recited defendant's expressed reason for his request to represent himself. We note here that, in assessing whether a defendant's *Faretta* motion was untimely and equivocal, the court in *People v. Scott* (2001) 91 Cal.App.4th 1197, stated: "[T]he motion was not unequivocal. Scott made his *Faretta* motion immediately after the trial court denied his *Marsden* motion, and Scott's subsequent comments suggest he made the *Faretta* motion only because he wanted to rid himself of appointed counsel." (*Id*. at p. 1205, fn. omitted & some italics omitted.) We could say the same of defendant's *Faretta* motion here.

The trial court remarked on the length and stage of the proceedings. Defendant was arraigned on May 8, 2020, three years and eight months before defendant's second *Faretta* motion. The court continued, "[w]e've got jurors ordered, witnesses lined up . . . ." The court noted the case had been "continued, set, reset." As stated, defendant's request came on the day the court was ruling on in limine motions, the day before jury voir dire and the swearing in of the jury, and two days before presentation of evidence was to commence.

Defendant represented that he would be ready for trial, and therefore that the change would not cause any delay, and that he was not engaging in gamesmanship. However, as we have stated, the record supports an implied finding that the request was for purposes of, or would cause, delay.

Based on our consideration of these factors, we cannot conclude that the trial court abused its discretion in denying defendant's untimely *Faretta* motion.

23

IV

*Rap Video Evidence*

A.      *Additional Background*

Over codefendant Rhode's motion in limine, in which defendant joined, the trial court granted the prosecutor's request to admit two YouTube videos at trial.  In one of the videos, entitled "Ima S.T.A.R.," both victims, A.J. and K.K., appeared, displaying Stickup Starz gang signs and demonstrating their connection to that gang.  The other video, entitled "Tha Truth," was by an influential Oak Park Bloods member, in which he disparaged Stickup Starz members, including A.J.  The prosecutor stated that this video demonstrated that both victims would be targeted by the Oak Park Bloods because of "their overt representation of their gang and disrespect of the Oak Park Bloods."  Neither of the videos featured defendant or codefendant.  Additionally, "Tha Truth" video predated the shooting here by perhaps 10 years, and the "Ima S.T.A.R." video was made approximately seven years before the shooting.  The trial court granted the prosecutor's request, allowing the prosecutor to play 45 seconds of "Ima S.T.A.R." and one minute and 10 seconds of "Tha Truth" video at trial.

Defendant argues that the trial court abused its discretion and violated his due process rights by admitting the videos because they were inadmissible under Evidence Code section 352.2 and their probative value was substantially outweighed by their prejudicial effect.  Even assuming for argument's sake that the trial court erred in admitting the videos, we conclude that any error did not prejudice defendant.

B.      *Standard of Review*

Defendant argues the error violated his due process rights and therefore must be assessed for prejudice under the standard from *Chapman v. California* (1967) 386 U.S. 18.  We agree with the People's argument that prejudice based on the improper admission of evidence following an exercise of discretion is assessed under the standard in *People v. Watson* (1956) 46 Cal.2d 818.  (See *People v. Hin* (2025) 17 Cal.5th 401, 482; *People v.*

24

*Coneal* (2019) 41 Cal.App.5th 951, 972; see also *People v. Marks* (2003) 31 Cal.4th 197, 226-227 [application of ordinary rules of evidence like Evid. Code, § 352 does not implicate the federal Constitution and review is under *Watson*].)  Under *Watson*, " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955; *Watson,* at p. 836.)

  C.  *Prejudice*

  Detective McDonald testified that defendant and codefendant Rhodes were both Oak Park Bloods gang members.  Defendant and codefendant both had gang-related tattoos.  Both had been observed in the presence of gang members.  Both posted photos to social media in which they were throwing up Oak Park Bloods gang signs and were with other Oak Park Bloods members.

  Detective McDonald testified that the primary rivals of the Oak Park Bloods are the Stickup Starz.  The two gangs engaged in shootings and fights with each other.  In August 2019, matters between the two gangs were bad.  Defendant once said to a police officer, "Starz down," meaning "he don't mess with the Star[z] gang members."

  Although they both denied it at trial, the evidence established that A.J. and K.K. were both members of the Stickup Starz.  A.J. told Detective Zakrzewski that he was a known Starz gang member.  In a phone call with the prosecutor, A.J. said he was "a gang member from one side and they're gang members from the other side."  Detective McDonald testified that both A.J. and K.K. were members of Stickup Starz in August 2019.  He also testified that A.J. and K.K. appeared in rap gang videos posted to YouTube.

  In surveillance video, the black Pontiac driven by codefendant Rhode can be seen pulling into the Pints-N-Fifths liquor store on Stockton Boulevard.  Around this time, between 12:40 and 12:46 p.m., call detail records indicated that a cell phone associated with defendant was in the area of the Pints-N-Fifths liquor store.  Before codefendant's

arrival at this location, he had told K.H. that he was with "Nick" and "Drai." Defendant's first name is Nicholas, and the surveillance video established that there was a third person in the Pontiac. An individual who looked like defendant in stature and appearance, including his beard, got out of the car and looked around. Thus, while no witness testified to seeing defendant at the liquor store, or later at the intersection, the circumstantial evidence was strong that defendant was in the black Pontiac.

At some point, A.J. and K.K.'s vehicle pulled into Pints-N-Fifths. Later, A.J. drove off, turning right out of the parking lot. The black Pontiac followed A.J.'s car out of the parking lot.

In surveillance video recorded at 65th Street and Stockton Boulevard, the black Pontiac driven by codefendant Rhode can be seen pulling up next to A.J.'s vehicle. An object extends out of the driver's side rear window, and then muzzle smoke appears in that window. A.J. and K.K. both were shot. The shooting occurred around 12:57 p.m. Detective McDonald testified that if the occupants of the black Pontiac were Oak Park Bloods members, as defendant and codefendant Rhode were, they would have a motive to kill A.J. because he was a known Starz member and was in videos disrespecting Oak Park Bloods.

Eight days after the shooting, E.H. reported in a 911 call that defendant was pointing a black nine-millimeter handgun at his sister. Detective Johannes recovered a Springfield nine-millimeter firearm, which S.D. indicated belonged to defendant.

Law enforcement found 10 nine-millimeter cartridge casings in the intersection where the shooting occurred. Criminalist Zerbe concluded that all 10 cartridge casings were all fired by the Springfield nine-millimeter firearm.

We conclude that it is not reasonably probable that the defendant would have obtained a more favorable result absent an error in admitting the two rap music videos. The presentation of the video evidence was brief, totaling less than two minutes. As defendant argues in asserting that the videos should not have been admitted, the videos

26

were cumulative of other evidence, and thus the facts proved by the videos were proved by other, less prejudicial evidence.

The trial court instructed the jurors that they "may consider evidence of gang activity only for the limited purpose of determining whether: [¶] One: The defendants had a motive to commit the crimes charged. [¶] Or two: The defendants intended to kill [A.J.]. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendants are persons of bad character or that they have a disposition to commit crime." (CALCRIM No. 1403; see Evid. Code, § 352.2, subd. (a)(2).) To the extent the videos could have "inject[ed] racial bias into the proceedings" (Evid. Code, § 352.2, subd. (a)(2)), and contained misogynistic and homophobic content, the trial court also instructed the jurors that they were not to "let bias, sympathy, prejudice or public opinion influence" their decision, and that "bias" included bias based on gender, race, ethnicity, and sexual orientation. (CALCRIM No. 200.) "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

We do not agree with defendant's argument that the jury may have used these video clips to establish identity. First, contrary to defendant's characterization, we have concluded that the evidence of defendant's presence in the black Pontiac as the shooter was strong. Second, the videos would fall within the ambit of "gang activity," addressed in CALCRIM No. 1403. In any event, defendant does not adequately explain how he believes the jury improperly used the evidence to establish identity or sufficiently support that claim with authority.

It is not reasonably probable that the defendant would have obtained a more favorable result absent any error in admitting the two videos.

27

# V

*Ineffective Assistance of Counsel–Firearms Expert's Testimony*

A.    *Additional Background*

On cross-examination, criminalist Zerbe acknowledged that he did not consider in his analysis other similar firearms for comparison purposes. Asked how he could determine, in a scientific manner, what is a unique toolmark feature of a gun without comparison with other guns, Zerbe responded that there were "a number of studies that have been conducted using the same machining that is in . . . this situation, using a broach to cut a breech face, and the resulting surface features are not the same from consecutively manufactured slides." Counsel also asked if there were studies involving 50 or 100 guns of the same manufacturer, model, and caliber "and firing them to see how many of those look exactly alike or to where you could find the same type of impressions that you're finding within this piece?" Zerbe was not aware of any study involving 100 firearms. Later, when defense counsel asked if he used any control group, Zerbe responded, "I'm not doing a validation study. There is no need for a control group." When counsel asked if Zerbe's approach required verification involving other firearms, Zerbe responded that it would "make[] no sense to do that," because "it's absurd."

On redirect, criminalist Zerbe testified that "there have been many studies by very reputable testing laboratories like Ames Research Laboratory with Iowa State University. [¶] There are two studies–validation studies directly assessing the scientific validity of the science, along with another study by Cadre Forensics . . . . [¶] There are many studies in the last five to ten years that also include the use of search-based algorithms . . . by . . . the National Institute of Standards and Technology." Asked why it would not make sense to compare test fires to test fires from a different firearm, Zerbe testified that "I am interested in the firearm in question, whether it did or did not fire the ammunition in question."

Criminalist Zerbe testified that there had been studies where different firearms were compared against each other. However, they did not involve as many as 100 firearms, but more along the lines of 20 to 30 firearms. According to Zerbe, it had been "routinely shown that employing the methods that are used in the field, that they can be discriminated from each other."

Criminalist Zerbe testified that he was unaware of any study disproving the validity of the criteria he used. Asked whether he had ever experienced "the level of individual agreement that you observed in this case in terms of the test fires versus the evidence, cartridges that you reviewed other than when both of those cartridges were fired from the same firearm," Zerbe responded, "[n]o, I've never observed that level of agreement unless it was from the same firearm."

Defendant argues he was deprived of the effective assistance of counsel by his attorney's failure to file a motion to exclude or limit criminalist Zerbe's testimony and failure to impeach Zerbe's testimony that he was unaware of any study disproving the validity of the criteria he used with certain studies. We disagree.

B. *Ineffective Assistance of Counsel*

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

With regard to deficient performance, " '[w]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient.

29

(*Strickland v. Washington, supra*, 466 U.S. at pp. 693-694; *People v. Ledesma, supra*, 43 Cal.3d at pp. 217-218.)  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  (*Strickland,* at p. 697.)

> C.    *The Trial Court's Gatekeeping Function and* Azcona

A "trial court has the duty to act as a 'gatekeeper' to exclude speculative expert testimony."  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 753.)  "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative."  (*Id*. at pp. 771-772.)

Defendant analogizes the circumstances here to those in *People v. Azcona* (2020) 58 Cal.App.5th 504 (*Azcona*).  In *Azcona*, a firearms expert testified that he compared cartridge casings from two different crime scenes and concluded that they were fired from the same gun.  (*Id*. at p. 510.)  He explained:  " 'I need to see six individual marks in a row . . . to meet my identification criteria.  That's based on the fact that nobody's ever seen that many by random chance.  [¶]  We've done numerous studies on the subject trying to see what can happen by random chance, and that's much more than can ever happen by random chance.  [¶]  So if you see these marks and all your class characteristics are the same and you can identify the source of the marks, it is possible to say they were fired from the same gun.  And the thing that's good to add on [nowadays] is not just that they were fired from the same gun, but to the practical exclusion of all other guns.' "  (*Ibid*.)

The *Azcona* court first concluded that defendant failed to meet his burden of showing that the validity of the expert's technique had been undermined to the point that "firearm toolmark comparison testimony is no longer admissible in California."  (*Azcona,*

30

*supra*, 58 Cal.App.5th at p. 513.)  The court found, however, that the trial court had abused its discretion by abandoning its gatekeeping responsibility and allowing the expert to testify to conclusions that "went far beyond what the underlying material supported." (*Ibid*.)  The court concluded:  "the court allowed the expert to testify that the matching marks on the relevant projectiles are 'much more than can ever happen by random chance,' and therefore the projectiles came from the same gun, 'to the practical exclusion of all other guns.'  The expert did not support that conclusion with anything more definitive than a broad reference to having 'done numerous studies on the subject trying to see what can happen by random chance.'  [¶]  Such a purportedly infallible conclusion is a leap too far from what the underlying method allowed.  There was support for the opinion that the projectiles likely came from the same gun, perhaps more likely than not, but there was no basis to present it as a scientific certainty."  (*Id*. at pp. 513-514.)

        D.     *Motion In Limine to Exclude or Limit Criminalist Zerbe's Testimony*

Defendant argues his attorney was ineffective because he did not file a motion to exclude criminalist Zerbe's testimony that the firearm associated with defendant was used in the shooting.  The *Azcona* court determined that the defendant failed to meet his burden of demonstrating that the technique involving the visual comparison of toolmarks on bullet casings had been undermined to the point it was no longer admissible in California.  (*Azcona, supra*, 58 Cal.App.5th at p. 513.)  Defendant has not directed us to any case since *Azcona* that has determined that the toolmark comparison method employed by Zerbe is no longer admissible in California, and we are not aware of any.  Nor has defendant offered any other support for the premise that the trial court would have granted a motion to exclude Zerbe's testimony altogether.  Counsel is not ineffective for failing to make a meritless motion or objection.  (See, e.g., *People v. Pierce* (2015) 234 Cal.App.4th 1334, 1337.)

Defendant also argues counsel was ineffective for failing to move in limine to limit criminalist Zerbe's testimony to opinions supported by the underlying material and

31

methodology. According to defendant, Zerbe's opinion testimony is "indistinguishable" from that in *Azcona*. Even if defense counsel's performance was deficient, we conclude that defendant was not prejudiced because Zerbe's testimony differed in crucial respects from that disapproved in *Azcona*.

Defendant relies on criminalist Zerbe's testimony about the level of agreement he observed. Asked whether he had ever seen "the level of individual agreement that you observed in this case in terms of the test fires versus the evidence, cartridges that you reviewed other than when both of those cartridges were fired from the same firearm," Zerbe responded, "[n]o, I've never observed that level of agreement unless it was from the same firearm." This testimony conveyed Zerbe's personal experience in comparing toolmarks on cartridge casings and, if he had previously observed the level of agreement he saw in this case, his opinion had been that the cartridge casings had been fired from the same firearm. This testimony did not purport to inject "scientific certainty" into his opinion or to bolster his opinion with statistical or quantitative representations unsupported by the underlying material. (*Azcona, supra*, 58 Cal.App.5th at p. 514.)

Defendant also highlights criminalist Zerbe's testimony that it would have been absurd to compare the cartridge casings recovered from the scene of the shooting with those fired from other firearms because he was "interested in the firearm in question, whether it did or did not fire the ammunition in question," and that there was "no need for a control group." Zerbe's testimony was not "expert testimony that went far beyond what the underlying material supported." (*Azcona*, *supra*, 58 Cal.App.5th at p. 513.) It described the underlying methodology. Zerbe further testified that "there have been many studies by very reputable testing laboratories like Ames Research Laboratory with Iowa State University. [¶] There are two studies–validation studies directly assessing the scientific validity of the science, along with another study by Cadre Forensics that was using virtual comparison microscopy . . . . [¶] There are many studies in the last five to ten years that also include the use of search-based algorithms . . . by . . . the National

32

Institute of Standards and Technology." While there have also been studies critical of this methodology (see *id*. at pp. 520-522 (conc. opn. of Greenwood, P.J.)), it has not been deemed inadmissible.

Criminalist Zerbe's testimony is not "indistinguishable" from the disapproved testimony in *Azcona*. A motion in limine to limit Zerbe's testimony, premised on *Azcona*, would not have resulted in the exclusion of the testimony defendant objects to here. Therefore, it is not reasonably probable that defendant would have received a more favorable result had counsel moved in limine to limit Zerbe's testimony.

E.    *Failure to Impeach with Studies*

Defendant's next argument is that his attorney was ineffective for failing to impeach criminalist Zerbe's testimony. Zerbe testified that he was unaware of any study disproving the validity of the criteria he used. Defendant acknowledges that "[i]t might be technically correct that Zerbe's methodology had not been disproved," but he further argues that, according to the studies discussed in Presiding Justice Greenwood's concurring opinion in *Azcona*, that "methodology has never been proven to be scientifically valid in the first place." Defendant argues that reasonably diligent counsel would have kept abreast of these studies and would have impeached Zerbe's testimony with them.

A 2008 report of the National Research Council of the National Academies found that the " 'validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated.' " (*Azcona*, *supra*, 58 Cal.App.5th at p. 521 (conc. opn. of Greenwood, P.J.).) That report also concluded that " '[f]irearms identification ultimately comes down to a subjective assessment,' " and " 'an examiner's assessment of the quality and quantity of resulting toolmarks and the decision of what does or does not constitute a match comes down to a subjective determination based on intuition and experience.' " (*Ibid*.) A 2009 report by the same body stated that " '[s]ufficient studies have not been done to understand the reliability

33

and repeatability of the methods' " used by toolmark examiners.  (*Ibid*.)  A 2016 report of the President's Council of Advisors on Science and Technology (PCAST) concluded: " 'firearms analysis currently falls short of the criteria for foundational validity, because there is only a single appropriately designed study to measure validity and estimate reliability.  The scientific criteria for foundational validity require more than one such study, to demonstrate reproducibility.' " (*Id*. at p. 522 (conc. opn. of Greenwood, P.J.).)

Even if we were to conclude counsel's performance was deficient for failing to impeach criminalist Zerbe with these studies, we would conclude that any error did not prejudice defendant.  The relevant import of these studies is that toolmark analysis, like that performed by Zerbe, is subjective, and that its validity has not been fully established.  As the People argue, Zerbe never testified that his methodology was objective.  While impeachment with reports concluding that the validity of toolmark analysis has not been fully established could undermine Zerbe's opinion in the eyes of the jurors to a degree, defendant has not demonstrated that it is reasonably probable that the jury would have rejected Zerbe's conclusions, and that defendant would have achieved a more favorable result, had counsel impeached Zerbe with these reports.

Lastly, defendant argues that criminalist Zerbe's testimony that "[n]o one has ever observed a single group of four consecutive matching stria unless it was produced by the same tool" was contradicted by the Ames Research Laboratory study as stated in the PCAST report.  This argument was raised for the first time in defendant's reply brief. " ' "Obvious considerations of fairness in argument demand that the appellant present all . . . points in the opening brief.  To withhold a point until the closing brief would deprive the respondent of [the] opportunity to answer it or require the effort and delay of an additional brief by permission.  Hence . . . points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before." ' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

34

*Ineffective Assistance of Counsel–Jail Fight, Misconduct, and Testimonial Hearsay*

A.   *Jail Fight*

Detective McDonald testified that he reviewed a report concerning a jail fight in which defendant was involved.  He testified that three of the participants were Oak Park Bloods, and a fourth was a member of the East Side Piru gang and was associated with the Oak Park Bloods.  Detective McDonald testified that the victim was associated with Meadowview, which did not get along with the Oak Park Bloods.  According to Detective McDonald, defendant initiated the confrontation by punching the victim, and then the others jumped in.  Detective McDonald testified that this incident served as a show of force in the jail pod and would instill fear in others not affiliated with Oak Park Bloods.  He opined that this was a gang-related incident, although he acknowledged he had not talked to any of the participants.

Defendant argues that this evidence was cumulative to other gang membership evidence and prejudicial, that Detective McDonald's opinion was speculative, and that his attorney was ineffective for his failure to object to its admission.  Turning directly to prejudice, the grounds defendant relies upon in arguing that it is reasonably probable he would have achieved a more favorable result had counsel objected to this evidence are that there was already ample gang evidence, his opinion that the proof of his guilt was not overwhelming, and that the evidence posed the risk that the jury would convict defendant on an improper basis.  We are not persuaded.

There was substantial gang evidence presented in this case, but "the prosecutor is not required 'to present its case in the manner preferred by the defense.' " (*People v. Clark*, *supra*, 52 Cal.4th at p. 894.)  Defendant has failed to persuade us that the evidence of his guilt was weak.  And the jail fight evidence was brief, and less inflammatory than the charged conduct.  (See *People v. Tran* (2011) 51 Cal.4th 1040, 1050 [evidence was not unduly prejudicial; it was less inflammatory than testimony about the charged

35

offenses].) Defendant has not established that it is reasonably probable that he would have achieved a more favorable result had counsel objected to the jail fight evidence.

B.     *Prosecutorial Misconduct*

Defendant argues his trial attorney was constitutionally ineffective for failing to object to prosecutorial misconduct. He argues that the prosecutor committed misconduct in arguing to the jury that it could consider defendant's Yuba County assault of S.D. to establish consciousness of guilt in violation of the trial court's limitation of the purpose for which that evidence was admissible.

The trial court instructed the jury: "[Y]ou heard testimony referencing the arrest of [defendant] in Yuba County . . . . That was evidence that the People offered because of their contention that it's relevant to issues related to the gun . . . . It is not evidence of [defendant's] criminal history or background or propensity to commit crime or to do anything wrong. So I do not want you to receive it for that purpose at all. Do not consider that as evidence in connection at all with this case except with respect to evidence of . . . the gun if you find that it's relevant to that."

Later, in a jury instructions conference, the prosecutor requested CALCRIM No. 362 on consciousness of guilt. This request was based on defendant's interaction with law enforcement in the Yuba County case. The trial court declined to give the instruction, but continued, "You can, of course, still argue that [defendant] was misleading or dishonest or confabulating, or whatever you want, in connection with the statements to Yuba County law enforcement. You don't need this instruction for that purpose."

In closing argument, in reference to the Yuba County incident, the prosecutor argued: "You can also consider [defendant's] behavior in that case for consciousness of guilt." Defendant's attorney did not object.

Defendant's argument is that "[t]he trial court here expressly ruled [defendant's] *assault of [S.D.]* was only admissible to prove his possession of the gun and not his

36

propensity or any other purpose and denied the prosecutor's request to instruct the jury that it showed consciousness of guilt." (Italics added.) Defendant argues that the prosecutor committed misconduct in violating this ruling.

Defendant has not established deficient performance. Counsel reasonably could have believed that any objection would be futile because the prosecutor, in raising consciousness of guilt, was referring to defendant's evasive conduct with law enforcement, which the trial court expressly stated the prosecutor could argue, not defendant's assault of S.D. (See *People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1193-1194 [counsel not ineffective for failing to make futile objection].)

C.      *Testimonial Hearsay*

Defendant also argues that, at the bifurcated trial on the gang allegations, Detective McDonald offered testimony that constituted testimonial hearsay, specifically various individuals' admissions to being gang members. This testimony included Detective McDonald's representations that several individuals had admitted directly to him that they were Oak Park Bloods gang members, as well as booking statements regarding gang affiliations. Yet defense counsel failed to object on this ground.

Defendant again has not established deficient performance. Putting aside the question of the potential merit of objections to this testimony, in each case, defense counsel could have tactically opted against challenging Detective McDonald's benign testimony that certain individuals admitted to him that they were gang members. If defense counsel chose to make these objections, to the extent relevant, the individuals' gang affiliation could have been established through more prejudicial and time-consuming means, such as by identifying gang tattoos and gang signs in photos of the individuals, offering gang-related social media posts, and offering competent, admissible evidence of prior convictions and gang enhancements, if any. Alternatively, counsel could have decided against objecting, believing that individuals' gang membership was already established by other evidence. Because we cannot say that there could be no

37

conceivable reason for counsel's choice not to object to this testimony, defendant has not established deficient performance.  (See generally *People v. Johnsen*, *supra*, 10 Cal.5th at p. 1165.)

DISPOSITION

The judgment is affirmed.

\s\ ,
Krause, J.

We concur:


\s\ ,
Hull, Acting P. J.


\s\ ,
Boulware Eurie, J.